Argued January 4, affirmed January 25, 1921.

# STATE v. WONG WEN TEUNG.

(195 Pac. 349.)

**Witnesses—Redirect Examination of Witness Held Admissible.**

1. In a prosecution of a Chinaman for murder, involving the question of defendant's identity as the slayer, where a witness who testified on direct examination that she saw a man who in height, build and movement resembled the defendant shoot the deceased was cross-examined as to whether most Chinamen whom she had seen were not of the same size and build, testimony on redirect examination that witness had picked defendant out of a number of Chinamen as the one who corresponded in size and build and gen-

eral appearance with the man who did the shooting, *held* admissible to rebut the inference that all Chinamen fitted the description of the one who committed the crime.

### Criminal Law—Defendant's Statement That He had Previously Been Confined in Jail Without Proof That Statement was Voluntary Held Harmless.

2. In homicide prosecution, police officer's testimony as to his conversation with defendant in which defendant admitted that he was confined in jail six weeks previous to the arrest for the homicide, without preliminary proof of voluntariness, held harmless, where such fact appeared in the narration only incidentally, and where court emphatically instructed jury not to consider the fact that defendant had been previously confined in the jail.

### Criminal Law—Defendant's Admission of Extraneous Facts Does not Require Preliminary Proof as to Voluntariness.

3. Defendant's admission of extraneous facts not involving guilt could be received in evidence of such facts, without preliminary proof of voluntariness, as required in regard to a confession acknowledging guilt or an admission in the nature of a confession.

### Homicide—Testimony as to Defendant's Residence at Time of Homicide Held Material.

4. In prosecution for murder, where it was the theory of the state that the crime had been minutely planned, and had been committed by someone who was familiar with the locality and acquainted with the habits of deceased as to the customary time of leaving his place of business, testimony as to the length of time defendant had lived in the city and his place of abode at time of homicide *held* material.

### Witness—Defendant Who Testified in Own Behalf may be Cross-examined as to All Matters Pertaining to Direct Examination.

5. A defendant who elected to testify in his own behalf, under Or. L., Section 1534, waives the constitutional protection guaranteed by Constitution, Article I, Section 11, as to matters germane to facts testified to on direct examination, and, subject to the limitation that the cross-examination shall pertain to the testimony given upon the examination in chief, the accused subjects himself to the same liabilities on cross-examination as other witnesses.

### Witnesses—Cross-examination of Defendant Held Proper.

6. In prosecution of a Chinaman for murder, where defendant on direct examination denied that he was connected with the commission of the crime or that he was acquainted with the deceased and testified that he had no motive for committing the murder, cross-examination as to how long he had been in the city, as to his purpose in coming to the city, and as to his membership in certain Chinese organizations *held* proper.

### Criminal Law—Misconduct of Counsel not Considered in Absence of Ruling on Exception Thereto.

7. Alleged misconduct of counsel will not be considered on appeal where there was no ruling by the court on exception taken thereto.

Criminal Law—Error must be Predicated on Ruling of Court.
8.   Generally, error must be predicated upon some ruling or de-
cision of the trial court in order to review the same on appeal to
Supreme Court.

From Multnomah: WILLIAM N. GATENS, Judge.

⌐ Department 1.

Defendant, Wong Wen Teung, was indicted for the
crime of murder in the second degree for shooting and
killing one Joseph Gue on March 27, 1917, in Mult-
nomah County. He was tried by the court and a
jury, resulting in a judgment of conviction on June
27, 1917, and appeals.

The evidence produced at the trial indicated that
Joseph Gue was the proprietor of an oyster-house
located on the south side of Madison Street, between
Second and Third Streets, in the City of Portland,
the premises being known as No. 250 Madison Street.
Madison Street runs in an easterly and westerly di-
rection, and is crossed by both Second and Third
Streets, the latter being one block west of the former.
Jefferson Street runs parallel to, and one block south
of Madison Street, and is likewise crossed by Second
and Third Streets.   At approximately 8 o'clock on the
evening of March 27, 1917, Joseph Gue and one of his
employees, Tony Maravitch, left the oyster-house be-
fore mentioned, and while Joseph Gue locked the door
thereof Maravitch proceeded to crank a two-seated
Ford automobile belonging to Gue and which for some
time previous thereto had been standing in front of
the oyster-house, facing in an easterly direction.   Mar-
avitch thereupon took his place on the left side of the
front seat of the automobile, preparing to drive the
same, and Joseph Gue seated himself beside Mara-
vitch.   As the latter started the automobile in motion
an exclamation from Joseph Gue caused Maravitch

99 Or.—7

to look towards the sidewalk alongside the automobile, and at that time he saw defendant take a gun from his pocket and discharge the same into the automobile. A number of shots were fired from the south side of the automobile, and after a brief interval a number from the north side. Maravitch brought the automobile to a stop near the southwest corner of Second and Madison Streets. The shooting resulted in the death of Joseph Gue and in the wounding of Maravitch.

The evidence adduced further purported to disclose that prior to the shooting a small runabout automobile had been standing on the south side of Madison Street near the intersection of Third Street and defendant was seated therein apparently awaiting an opportunity to carry out his purpose; that when Joseph Gue came out of his place of business, as heretofore related, the runabout automobile was driven easterly on Madison Street to a point near where the automobile of the deceased was standing; and that defendant then jumped from the running board of the runabout and committed the crime for which he stands convicted. After the shooting defendant ran south on Second Street to Jefferson Street, then ran up Jefferson Street to Third Street, and after running south on Third Street some two blocks was captured by Ray C. Blackmar, who had closely followed, and had not lost sight of defendant, from near the scene of the shooting.

The defense offered was that of mistaken identity.

AFFIRMED.

For appellant there was a brief over the names of *Messrs. Winter & Maguire* and *Mr. John F. Logan,* with an oral argument by *Mr. Robert F. Maguire.*

For the State there was a brief over the names of *Mr. Dan J. Malarkey, Mr. Walter H. Evans*, District Attorney, and *Mr. E. F. Bernard*, Deputy District Attorney, with oral arguments by *Mr. Malarkey* and *Mr. Bernard*.

BEAN, J.—Upon the trial Mrs. Etta C. Parrish, a witness for the state, testified on direct examination that she saw a man, who in height, build, and movement, resembled the defendant, shoot the deceased and then run around the corner. She did not positively identify the defendant. She did not see the face of the man who did the shooting. On cross-examination she was asked numerous questions tending to elicit testimony to show that most other Chinamen were of the size and build attributed by the witness to the man who did the killing. She was asked if it was not true that most Chinamen whom the witness had seen were of the size and build described by her, to which interrogatory she answered in the affirmative. Over the objection and exception of defendant, on redirect examination, after directing her attention to her former testimony, she was interrogated and answered as follows:

"Q. * * As bearing upon that phase of your testimony, I want to ask you if it is not the fact that you looked at a number of Chinamen together very recently and for the purpose of seeing if you could pick out of them the one who corresponded in size and build and you knew him?

"A. Yes, sir. * *

"Q. When and where was it you were exhibited a number of Chinamen together to see whether or not you could pick the one out of the number all together that corresponded in size and build and general appearance with the man who did the shooting?

"A. I saw a number together upstairs, but I simply picked him out as the one I saw, the first time, in jail when the detective brought him in."

1. The admission of this testimony is the first error assigned. It is clear from the testimony that the witness, Mrs. Parrish, only attempted to identify the defendant, not as the man who did the shooting, but as corresponding in size and build to that person. The plain purpose of the questions was to enable the witness, Mrs. Parrish, by giving antecedent circumstances, to remove the inference left by the cross-examination. This is one of the very important purposes for which a redirect examination is permitted: *State* v. *McGahey*, 3 N. D. 293, 298 (55 N. W. 753). It appears from the testimony elicited upon cross-examination that the defense examined the witness, Mrs. Parrish, as to the size and build of Chinamen in general, and as to their comparison with the man whom the witness saw doing the shooting. The witness indicated that the description which she had given would fit most other Chinamen. This subject was a branching off from the direct examination and tended to leave the jury to draw an inference that there was nothing in the size and build and general characteristics of the man who did the shooting to identify him with the defendant more than with other Chinamen. It is difficult for a witness to particularly describe a person. In view of the nature and extent of the cross-examination, it was not error on redirect examination to show that when Mrs. Parrish saw a number of Chinese together she was able to pick out the one who corresponded in size and build to the man she had previously seen doing the shooting, in order to rebut the inference that all Chinamen fitted the description of the one who committed the crime: *Oregon-Wash. R. & N. Co.* v. *Spokane P. & S. Ry. Co.,*

83 Or. 528 (163 Pac. 600, 989, Ann. Cas. 1918C, 991);
*Farmers' Bank* v. *Saling*, 33 Or. 394, 397 (54 Pac.
190); *Willis* v. *Horticultural Fire Relief*, 77 Or. 621,
625 (152 Pac. 259); 40 Cyc. 2520 et seq.; 5 Jones on
Evidence, § 871 et seq.; *Commonwealth* v. *Hughes*, 183
Mass. 221, 225 (66 N. E. 716); *Walker* v. *State*, 136 Ind.
663, 667 (36 N. E. 356); Underhill on Criminal Evidence, p. 68, § 55.

2 Wharton's Crim. Ev. (10 ed.), Section 939, page
1807, upholds the identification by a witness after
arrest of accused, as the person whom he saw commit
the crime. The text is based upon *Yarbrough* v.
*State*, 105 Ala. 43 (16 South. 758, 10 Am. Crim. Rep.
57), and *Beavers* v. *State*, 103 Ala. 36, 38 (15 South.
616). In the latter case, which is similar to the one at
bar, the identity of the defendant with the assassin
was the matter in issue; his defense being an alleged
alibi. After the witness, Crowder, had testified to the
facts of the killing and the presence and flight of
the man, whom he saw run from near the scene of the
murder and his recognition of the defendant, as
the man; he further testified, on interrogation by the
state, that he saw the defendant the next morning
after the killing, when he was in custody of the officers.
Witness was then asked by the prosecution, "Did you
recognize the man then under arrest, as the man who
had done the assassination and run off the evening before?" Over the objection of the defendant the witness answered in the affirmative. It was held there
was no error in this ruling.

The authorities are somewhat conflicting in regard
to the identification of the accused from an inspection
of the person. Mr. Wharton says that—

"The prevailing weight of authority favors the relevancy of testimony obtained either by bodily ex-

hibition or examinations of accused'': 2 Wharton's Crim. Ev., § 937, p. 1800.

It seems to us that the real objection to the testimony is as to its weight, and not to its competency, although the challenge is not in that form. The defendant was positively identified as the man who committed the crime by Tony Maravitch, witness on behalf of the state, who was in the automobile with Joseph Gue when he was shot. The defendant was positively identified by Fred E. Folds, witness for the state, who was an eye-witness of the killing, as the person who did the shooting. The witness Folds also identified the defendant after he was arrested and brought back to the scene of the crime. The testimony tended to show that after the shooting the perpetrator ran south on Second Street. Ray Blackmar, a witness for the state, testified that at the time of hearing the shots fired he was a short distance away in an automobile, and upon approaching the scene saw a man running on Second Street; that he followed the man in his automobile for some little distance, keeping in sight of him, and apprehended him and brought him back to the place where the shooting occurred and turned him over to an officer.

The counsel for defendant cites and relies upon the case of *State* v. *Houghton,* 43 Or. 125 (71 Pac. 982), where the witness, who was an officer, was erroneously permitted to testify that the prosecuting witness recognized defendant's photograph at the police station, as a photograph of the person whom he claimed had committed the crime. The prosecuting witness, whose name was Balch, was not under oath when he made the statement, the substance of which was detailed by the officer. There was subsequent testimony tending to show that defendant's photograph was in the

rogues' gallery because of his having committed other
crimes, and the evidence tended to prove the com-
mission of other disconnected crimes by defendant.
This was held to be error. The case differs widely
from the case at bar.

Assignment of error No. 2 is predicated upon the
testimony of J. D. Webster, a police officer, who was a
witness for the state. He was asked if he knew the
defendant, Wong Wen Teung, and when and where
he had first seen him. He answered in effect that he
knew him by sight, could not give the exact date when
he first saw him, but it was about the middle of Feb-
ruary at the city jail. This was without any ob-
jections or suggestion of incompetency on the part
of defendant. The witness also stated that he saw the
defendant the next morning after the killing, March
27th, when he was in custody, and that he had a con-
versation with him on March 30, 1917, in the jail cor-
ridor, when Officer J. W. Moorelock was present.
Upon the witness being requested to state to the jury
what the conversation was, the witness was asked by
counsel for defendant, "Did you warn him that as a
defendant he had certain rights?" He answered,
"No," that he did not warn him at all, for the reason
that he had no intention of discussing anything about
the case. Objection was interposed by counsel for de-
fendant, to the effect that the defendant being in cus-
tody gives rise to the presumption that he was speak-
ing under duress and fear, and the testimony was "not
competent unless he be shown to have been warned in
making his statement of his rights and warned of the
fact that the statement might be used against him."
Upon the objection being overruled defendant's coun-
sel duly saved an exception. Whereupon the witness
stated in effect, that he asked defendant how long he

had been in Portland, and was told, "about six weeks," and asked, "Where did you [the defendant] come from?" and was told "San Francisco," and that then the witness asked the defendant, "Were not you one of those five or six boys in No. 6 corridor over there about six weeks ago, coming up from San Francisco and being picked up by the detectives?" and that the defendant said, "Yes." The defendant was then asked, "What room he had been living in when he was arrested this time?" and said, "It was 225½ Main Street."

Defendant's counsel moved the court "to instruct the jury to disregard any of the testimony of the witness relative to any of the matters, other than those which refer to the location and movements of the defendant immediately prior to the twenty-seventh day of March." The counsel for the state stated that nothing was claimed for the fact that the defendant was arrested at the time mentioned. The court stated to the jury:

"We have the testimony of the witness to the effect that he was a recent arrival from San Francisco. I will instruct the jury that the fact he was in jail is not to be considered by them."

It is claimed in defendant's brief that it was error to admit the testimony in regard to the statements of defendant because "the questioning officer did not first make clear to the accused that his statements must be made voluntarily, and that when made they might be used against him at the trial." The same question was before this court in *State* v. *Wilder,* 98 Or. 130 (193 Pac. 444), in which an opinion was rendered November 23, 1920. In that case it was contended on behalf of the defendant that the admission of the testimony of the sheriff and his deputies re-

garding a confession made by the defendant after arrest and confinement in jail was error. It was shown that the confession was made without coercion or threats and without any promise of immunity. It was claimed by the defense that the defendant should have been warned that anything he might say would be used against him upon the trial, and that he need not make any statement unless he wanted to. It was held in an opinion by Mr Justice BENSON that:

"The fact that a confession is made without the accused having been cautioned that it may be used against him, does not render the evidence incompetent, unless there is a statute which invalidates a confession which is obtained when the accused is not so cautioned: 12 Cyc. 463. In this state we have no such statute, and it has been held by this court that a confession is not rendered inadmissible by the fact that accused had not been advised as to his legal rights: *State* v. *Scott,* 63 Or. 444 (128 Pac. 441); *State* v. *McPherson,* 70 Or. 371 (141 Pac. 1018)."

2, 3. It is contended on behalf of defendant that this testimony was offered for the purpose of showing that defendant had been arrested by the detectives and confined in jail some six weeks prior to the time of his arrest for the crime charged. It is apparent that the fact that the defendant had been in jail appeared in the narration referred to by the police officer only incidently. It was at first referred to without objection by defendant's counsel. The court plainly and emphatically instructed the jury, at the time, not to consider the fact that defendant was in jail. Under the circumstances of this case no error prejudicial to the rights of defendant was committed: *State* v. *Eggleston,* 45 Or. 346, 353 (77 Pac. 738); *State* v. *Foot You,* 24 Or. 61, 66 (32 Pac. 1031, 33 Pac. 537). It was not claimed by the officers that the defendant was

arrested for any crime. For aught that appears, he may have been detained for information or as a witness. There was no attempt to put the character of defendant in issue. The statement of the defendant alluded to was not a confession, but merely related to the time he came to the City of Portland and the place from which he came. It was an admission of extraneous facts, not involving guilt, and could be received in evidence of such facts, without preliminary proof of voluntariness, as required in regard to a confession acknowledging guilt, or an admission in the nature of a confession: *State* v. *Heidenreich,* 29 Or. 381 (45 Pac. 755); *State* v. *Brinkley,* 55 Or. 134, 140 (104 Pac. 893, 105 Pac. 708); *State* v. *Reinhart,* 26 Or. 466, 477 (38 Pac. 822); *Read* v. *State,* 195 Ala. 671 (71 South. 96); *People* v. *Weber,* 149 Cal. 325 (86 Pac. 671).

4. It is claimed by the defense that the statement of defendant to Officer Webster was not relevant or material. That part of the statement relating to the length of his residence in Portland, and his place of abode at the time of the homicide, was material. It was the theory of the state, and the purport of the evidence, that the crime had been minutely planned and committed by someone who was familiar with the locality and acquainted with the habits of the deceased, as to his customary time of leaving his place of business. The evidence indicated that the perpetrator was waiting and watching for the deceased in an automobile some half block distant, and instantly recognized him in the dusk of the evening when he came out of his store. The evidence disclosed that defendant when captured was fleeing in a direction opposite to his place of residence. There was no prejudicial error in admitting the testimony.

The third assignment of error relates to the cross-examination of the defendant, who testified as a witness, and related what he claimed was his connection with the shooting. He was asked where he was living the night that Joe Gue was shot, and answered that he was living in the laundry, and that he had been working there about five weeks, and stated the kind of work he had been doing; that at the time of the shooting he was standing at the entrance of a barber-shop on First Street a little over a block away from the scene of the crime, with the intention of getting a hair cut; that upon hearing the shots he became frightened and ran south on Third Street, a little over a block, and when he came to Jefferson Street and had crossed the intersection a man came running west on Jefferson Street and turned the corner about the same time defendant did and disappeared between two houses on the corner and he never saw him again; and that defendant ran on south to the corner of Columbia Street and was there captured.

On cross-examination by counsel for the state, defendant was asked the question, "When did you come here from San Francisco?" Over the objection and exception of defendant's counsel, that it was not proper cross-examination, he answered, "February 15, 1917." He was also asked, "When you came here from San Francisco, what did you come up here for?" To this question the same objection was made and exception saved. He answered, "I go on Ong Hans' Cannery, because in California I had drawn money to go to that cannery." Over the objection and exception of counsel for defendant the following testimony was elicited on cross-examination:

"Q. Do you belong to the Hop Sing Tong?
"A. Yes, sir.

"Q. How long have you belonged to the Hop Sing Tong?

"A. About, almost two years.

"Q. You belonged to it down in San Francisco?

"A. Yes, sir.

"Q. When did you come here from San Francisco?

"A. February 15, 1917.

"Q. That is after the American calendar? That was after this Tong War started, when you came here, between the Hop Sing Tong and the Suey Sing Tong and the Bing Kong Tong?

"A. I don't know which and which it was. At the time I only knew the Suey Sing and the Hop Sing. It does not relate to the Hop Sing. * *

"Q. Whereabouts is that cannery?

"A. I never been there. I don't know where the cannery is. * *

"Q. You were still in Portland on the 27th of March, on the night of the shooting? You had not gone to the cannery yet?

"A. No; the cannery people hadn't begun yet, and I was working here.

"Q. Well, did you work all the time you were here?

"A. Yes. * *

"Q. When you came to Portland there were several men came with you, were there not?

"A. Yes.

"Q. Did any of the rest of them go down to that laundry?

"A. No.

"Q. You were the only one that went to that laundry out of that bunch that came with you?

"A. Yes, sir.

"Q. These boys that came with you, you knew all of them didn't you?

"A. I didn't know them, but they were down in California. I knew them on the train, that is all.

"Q. Some of these boys who came on the train with you here are up in jail aren't they?"

To the last question objection was made, as not proper cross-examination, which objection was sus-

tained by the court. Counsel for defendant took exception to the action of counsel for the state in asking such a question as misconduct, but there was no ruling thereon made by the court.

It is contended by counsel for defendant that the cross-examination did not pertain to facts to which the defendant had testified upon his direct examination, and that the same was not proper cross-examination. Section 1534, Or. L., provides that a defendant in a criminal action is a competent witness in his own behalf, when offering himself as a witness, he shall be deemed to have given the prosecution a right to cross-examine upon all facts to which he has testified tending to his conviction or acquittal.

In the case of *State* v. *Bartmess,* 33 Or. 110, 124 (54 Pac. 167, 171), Mr. Justice MOORE, speaking for this court in regard to the scope of cross-examination, said:

"A fair construction of the statute in question leads us to conclude that defendant in a criminal action, having voluntarily testified in his own behalf, may be cross-examined in relation to all facts and matters germane to the testimony given by him on his examination in chief."

In the case of *State* v. *Miller,* 43 Or. 325, at page 330 (74 Pac. 658, at page 659), Mr. Justice WOLVERTON uses the following language:

"The statute, however, is not to receive an unduly restricted or narrow construction, and the cross-examination must extend the inquiry to facts and matters manifestly germane and relevant to the facts testified to in chief, tending to their explanation and elucidation, and in this respect may be as searching and broad as the foundation upon which it rests."

In *State* v. *Lem Woon,* 57 Or. 482, 490 (107 Pac. 974, 112 Pac. 427), which was a case in which many of

the features were similar to the case at bar, the defendant, Lem Woon, was convicted of murder in the first degree. The defendant testified in his own behalf in order to establish an alibi, to the effect that he was in his rooms at the time of the commission of the crime. He also testified at length as to what took place at the hospital, when he was taken there by the officers immediately after his arrest, for identification by the wounded man. The cross-examination related, among other things, as to whether or not one Jo Bong, whom he named as one who had eaten supper at his rooms, had gone out during the time referred to and how long he had been gone; also as to his acquaintance with, and his identification of, Lee Tai Hoy and Lee Hueng, who were at the hospital, and as to whose statements he had testified on direct examination. To this cross-examination defendant objected. Mr. Justice Eakin said, at page 492 of 57 Or. (at page 977 of 107 Pac.):

"Thus, even if the cross-examination does make him a witness against himself, it is not objectionable on account thereof, provided it relates to matters properly connected with his examination in chief. No error was committed in permitting this cross-examination."

In California under a statute (Pen. Code, § 1323) providing that, when the accused offers "himself as a witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief," it was held in the case of *People* v. *Fong Ching,* 78 Cal. 169 (20 Pac. 396), that testimony in chief by the accused as to his birth, parentage, education, and business, opened the door wide enough to allow him to be asked on cross-examination whether he had ever been arrested before. In *People* v. *Rozelle,* 78 Cal. 84 (20 Pac. 36), under such statute it was

held that a defendant who testifies that he did not commit the crime may be asked on cross-examination any question showing his testimony to be ·false, as whether he wrote a certain letter which contradicted his testimony: *People* v. *Cline,* 83 Cal. 374 (23 Pac. 391), is to the effect that one on trial for stealing property which he testifies he purchased of a certain person may be cross-examined as to the present whereabouts of the alleged vendor and the prisoner's efforts to procure his attendance at the trial: See note to *People* v. *Tice,* 15 L. R. A. 669.

5, 6. Under our statute, in a criminal proceeding defendant who elects to testify in his own behalf, waives the constitutional protection guaranteed by Article I, Section 11, Constitution of Oregon, as to all matters germane to the facts to which he has testified upon his examination in chief: *State* v. *Deal,* 52 Or. 568, 570 (98 Pac. 165). In the cross-examination of a defendant who is accused of a crime, the state should not be held to a rigid rule which would restrict the cross-examination, so as to prevent inquiry as to any matters which would throw light upon the testimony given in chief and properly connected therewith in any way. Subject to the limitation that the cross-examination shall pertain to the testimony given upon the examination in chief, the accused subjects himself to the same liabilities on cross-examination as do other witnesses: 1 Wharton, Crim. Ev., p. 905, § 430. It must be conceded that the prosecutor is not required to frame his questions in the language used by counsel upon the examination in chief. The inquiry upon cross-examination may extend to facts and circumstances apparently germane to the facts testified to in chief. The cross-examination may be as searching and broad as the foundation upon which it

rests.   The defendant had testified to the effect that he had no connection with the commission of the crime, that he was not acquainted with the deceased, and had no motive for committing the murder.   The cross-examination pertained to the matters elicited upon the examination in chief and did not transcend the bounds of the rule governing the same, as enunciated by the above authorities.

In the case of *State* v. *Jensen,* 70 Or. 156, 158 (140 Pac. 740), cited on behalf of defendant, the cross-examination related to a disconnected offense, which took place in Bellingham, Washington, involving trouble between defendant and a woman of that place. The case is not parallel with the one at bar.   The same may be said of the case of *State* v. *Saunders,* 14 Or. 300 (12 Pac. 441), where this inquiry was made of defendant on cross-examination, "Did you not kill a man in Texas before coming here?"   The defendant in the latter case was also interrogated in regard to his carrying a pistol, target practice, and being a center shot.

7, 8.   The defendant's counsel also makes objection to certain statements of the district attorney, in his argument to the jury in reference to the Hop Sing Tong headquarters, and in criticism of one Qung San's conduct in making arrangements for the convenience of the defense.   The prosecutor referred to Qung San as "counsel for the defendant" and made other remarks.   Exception was taken to the statement of the district attorney, but no ruling by the court was obtained thereon.   Therefore we cannot pass upon the matter.   As a general rule, error must be predicated upon some ruling or decision of the trial court in order to review the same upon appeal to this court: *State* v. *Anderson,* 10 Or. 448; *Boyd* v. *Portland Electric Co.,*

37 Or. 567, 570 (62 Pac. 378, 52 L. R. A. 509); *State* v. *McAvoy*, 57 Or. 1-4 (109 Pac. 763); *Watts* v. *Spokane P. S. Ry. Co.*, 88 Or. 192, 204 (171 Pac. 901); *State* v. *Kapsales*, 90 Or. 56, 58 (175 Pac. 433). We find no conduct on the part of the prosecution in the present case carried to that extent which would prevent a fair trial, or bring the case within the rule of *State* v. *Barton*, 70 Or. 470 (142 Pac. 348).

Finding no prejudicial error in the record, the judgment of the lower court is affirmed.     AFFIRMED.

BURNETT, C. J., and McBRIDE and HARRIS, JJ., concur.